FILE BY FAX

FILED

JUL 03 2024

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. **3:15-cr-00234-CRB-19** |
| Plaintiff, | |
| v. | **DEFENDANT'S REPLY TO GOVERNMENT RESPONSE DATED JUNE 11, 2024 RE DEFENDANT'S MOTION FOR SENTENCE REDUCTON UNDER 3582(c)(1)(A) (Compassionate Release)** |
| ARMAN ZARGARYAN, | |
| Defendant. | |
| | **Pro se Prisoner** |

Comes now the Defendant ARMAN ZARGARYAN, proceeding pro se, with Reply to the government Under Seal response dated June 11, 2024.  Defendant Zargaryan notes for the record that the June 11, 2024 Under Seal filing was only received by Defendant on June 29, 2024, as further outlined in Section I below.

## I.
## PROCEDURAL BACKGROUND

Defendant Arman Zargaryan filed a Request for Compassionate Release under 18 U.S.C. § 3582(c)(l)(A) with this Honorable Court on December 26,

1

2023. [Dkt.2095]. On January 9, 2024, the Government filed their opposition to Defendant's Motion. [Dkt.2013/2105] The Defendant filed his reply on January 18, 2024. [Dkt. 2125]. On March 7th, 2024 this Honorable Court issued a ruling [Dkt. 2136] The order denied Defendant's request without prejudice based upon a finding that Defendant did not exhaust his administrative remedies. The Court expressly held that because "Zargaryan has not exhausted his administrative remedies, this Court cannot rule on the merits of his compassionate release motion at this time." [Dkt. 2136;pg.3].  In its order the Court directed the government "to also file a declaration informing the Court either that (1) BOP medical staff has provided Zargaryan with an angiography, and any subsequent medical care deemed necessary by the results of the angiography, or (2) there is good reason that it has not done so, despite the letter from Zargaryan's primary physician."  The government filed responses on March 14 [Dkt 2139] and March 18 (Dkt 2142), neither of which directly conformed to the government order.  Defendant filed a response to the government on April 10, 2024 (Dkt 2148), and subsequently filed a Supplemental Memorandum on May 27, 2024 (Dkt 2149) which brought to the Court's attention new information from a Department of Justice Office of the Inspector General report published on May 22, 2024 and thus not previously available concerning conditions at Sheridan Camp.  On June 3,2024 the Court issued a new order directing government to clearly state by June 10, 2024 whether or not an angiography had been scheduled, and to perform an angiography no later than June 17, 2024, or explain why this was not done.  The government responded with an Under Seal filing on June 11, 2024.  Neither Defendant nor Defendant's counsel received a copy of the under seal until June 28, 2024, when after repeated calls to the AUSA, Defendant's counsel was provided a copy of the June 11, 2024 response. Defendant's counsel then provided Defendant a copy of the filing.

# II.
## DISCUSSION OF ADMINISTRATIVE REMEDIES

In the declaration of Jennifer Vickers, the government repeats its argument that administrative remedies have not been satisfied until or unless Defendant has endured the full process involving submission to the warden; appeal to the Regional Director; and appeal to BOP Headquarters. Defendant has already argued that such a process would be futile; moreover, requiring such an extended process is in clear contravention of Congressional intent of the First Step Act goal of streamlining the process by which prisoners may obtain judicial review in Compassionate Release cases.

In *United States v. Haney*, 454 F. Supp. 3d 316 (S.D.N.Y. 2020), the Court clearly articulates the correct reading of the matter:

> Importantly, § 3582(c)(1)(A) does not contain an exhaustion requirement in the traditional sense. That is, the statute does not necessarily require the moving defendant to fully litigate his claim before the agency (i.e., the BOP) before bringing his petition to court. Rather, it requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court.
>
> That the statute gives the defendant this choice is crucial to understanding Congress's intent. Generally, Congress imposes exhaustion requirements in order to "serve[ ] the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *United*

*States v McCarthy*, 503 U.S. at 145, 112 S.Ct. 1081. But the hybrid requirement in this statute -- either exhaust or wait 30 days -- substantially reduces the importance of the first purpose, as it allows a defendant to come to court before the agency has rendered a final decision. Indeed, anyone familiar with the multiple demands that the BOP has faced for many years in this era of mass incarceration can reasonably infer that Congress recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial. Congress was determined not to let such exigencies interfere with the right of a defendant to be heard in court on his motion for compassionate release, and hence only limited him to 30 days before he could come to court in the ordinary course. Thus, the reduction of the wait period to a mere 30 days also "unquestionably reflects" a third purpose, i.e., "congressional intent for the defendant to have the right to a meaningful and prompt judicial determination of whether he should be released." *United States v. Russo*, No. 16-cr-441 (LJL), ECF No. 54, at 4, 2020 WL 1862294 (S.D.N.Y. Apr. 3, 2020).

The Court therefore has the discretion to waive the exhaustion requirement where, as here, strict enforcement of the 30-day waiting period would not

4

serve these Congressional objectives. *United States v. Haney*, 454 F. Supp. 3d 316 (S.D.N.Y. 2020).

Also the following:

> That would be antithetical to the First Step Act. The First Step Act—and the critical 30-day lapse route it provided—directly responded to a compassionate-release system so plagued by delay that prisoners sometimes died while waiting for the BOP to make a decision. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice); *see also* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of First Step Act) ("[T]he bill expands compassionate release ... and expedites compassionate release applications."). *United States v. Rodriguez*, 451 F. Supp. 3d 392, 399 (E.D. Pa. 2020)

In sum, the clear intent of Congress's introduction of the "thirty day clock" process under the First Step Act was to streamline the procedure to enable prisoners to access timely judicial review without having to endure the lengthy and typically superficial BOP remedy process.  The position taken by the government that this applies only if the Warden fails to respond in 30 days defies both Congressional intent and common sense, by enabling the BOP to block an inmate and frustrate the objectives of Congress simply by having the Warden issue a perfunctory one sentence denial within 30 days purely as a tactic to

prolong the process.  The Court is respectfully urged to follow the clear intent of Congress and equitable considerations,  both of which dictate that the "30 day clock" applies in all cases, not just those where the Warden fails to respond within 30 days.

## III.
## THE DECLARATION OF FCI SHERIDAN'S CLINICAL DIRECTOR

The Declaration of Dr. Andrew Grasley, Clinical Director at Sheridan, contains numerous demonstrable factual inaccuracies that, taken in aggregate, result in a grossly distorted representation of Defendant Zargaryan's experience and circumstances at Sheridan.

Dr. Grasley states: "I saw Mr. Zargaryan the first time on October 6, 2023, for his initial chronic care visit. At that time, he did not complain of any chest pain and did not inform me that he had ben seen by a cardiologist prior ot his incarceration." (Grasley Declaration, Para 3." This statement by itself illustrates an extraordinary level of administrative dysfunction and/or willful misrepresentation of facts.

First, Dr. Grasley and FCI Sheridan medical staff at that time were in possession of Defendant Zargaryan's Presentence Report which under the heaing "Physical Condition" states:

> Mr. Zargaryan advised he suffers from high blood
> pressure and sleep apnea (verified). Medical records
> confirm he is prescribed Clonidine HCL 0.1mg, Aspirin
> 81mg, Amlodipine 10mg, Hydralazine 25mg, Losartan
> Potassium 100mg, Ibuprofen 600mg, Loratadine 10mg,
> Promethazine-DM syrup, and a Fluticasone spray. Mr.
> Zargaryan further advised he began experiencing issues
> relating to high blood pressure as a result of the stress in

6

connection with these legal proceedings. He also used to

drink alcohol frequently, which exacerbated the issue.

Mr. Zargaryan also previously contracted COVID-19 on

two occasions and recovered, but still experiences

frequent headaches and coughing. (PSR, Paragraph 98).

Moreover, upon his self-surrender on September 30, 2023, Defendant Zargaryan submitted numerous documents including his prescriptions, a letter from his Lakeside Healthcare stating he suffered from angina pectoris (Exhibit A)  and other items at his medical intake interview. At the intake interview Mr. Zargaryan clearly outlined his medical conditions in a manner that included forcefully alerting Sheridan staff to his heart, blood pressure, and liver problems.   The intake nurse received all documents and made copious notes.  Based on his statement, it appears that Dr. Grasley was unaware of, or was willfully ignoring, the PSR, the Lakeside letter, the prescriptions, and the intake interview notes when he met with Mr Zargaryan on October 6, 2023.

Moreover, on October 5, 2023, the day before the appointment described by Dr. Grasely, Defendant Zargaryan submitted an "Informal Resolution" complaint (Exhibit B)  in which he stated that since self-surrendering: "I have been asking for medical attention. I have a heart problem, liver, and high blood pressure.....I have submitted numerous cop-outs and I have seen a doctor and a nurse with no results." Again, Dr. Grasley makes no reference to this in his declaration and appears to be taking the position he was unaware of this complaint. Defendant Zargaryan submits that Dr. Grasley's lack of awareness and/or failure to acknowledge this complaint which pre-dated his October 6 interaction with Mr. Zargaryan is yet further evidence of dysfunction and willful neglect by the BOP Sheridan medical team.

In sum,  Dr. Grasley's statement in Para 3 that "At that time, he did not complain of any chest pain and did not inform me that he had ben seen by a

7

cardiologist prior to his incarceration" is simply not credible and is refuted by the PSR, Exhibit A, and Exhibit B.

Next Dr. Grasley says: "On December 15, 2023, M.r Zargaryan went to Sick Call Triage and mentioned to the paramedic that he had a cardiac examination prior to his incarceration. Mr. Zargaryan was scheduled to see the nurse practitioner. He was seen by the nurse practitioner on December 29, 2023, and discussed his cardiac concerns and prior workup with her." (Grasley Declaration Para 4). This falsely gives the impression that it was only on December 29, 2023, that Mr. Zargaryan's medical complaints became fully known. This was, in fact, after Mr. Zargaryan filed his motion for Compassionate Release on December 26, 2023. That motion provides a clear presentation of the many efforts made by Defendant Zargaryan between September 30, 2023 and December 26, 2023 to get reasonable medical attention.

Even after the Compassionate Release motion was filed and the Court became involved, Sheridan medical staff continued to be non-responsive in ways that eventually included the well documented non-response to the Court's order on March 7, 2024, leading to the Court's further order of June 3, 2024.

Defendant Zargaryan urgently entreats this honorable Court to recognize the futility of expecting the current FCI Sheridan medical staff to deliver critical medical care to Defendant Zargaryan in anything approaching a responsible, professional manner. Further, as will be detailed below, events since the June 3 Order provide yet additional justification for arriving at such a conclusion.

## IV.
## RECENT DEVELOPMENTS IN THE AFTERMATH
## OF THE COURT'S JUNE 3, 2024 ORDER

On June 13, 2024, Defendant Zargaryan was suddenly taken by BOP personnel for an angiography. This abrupt action appears to have been taken in response to the Court's June 3 order for Mr. Zargaryan to be given an angiography

by June 17th. From prior experience Defendant Zargaryan knows that normal procedure for an angiography involves a variety of preoperative tests and procedures . He therefore became understandably alarmed when it seemed it was the intention of FCI Sheridan medical staff to proceed to administer an angiography without these normal and necessary preoperative procedures. Of particular concern to Zargaryan was the fact that has a history of allergy to iodine or contrast dye—a condition he reported to the BOP Medical staff during his intake interview. Zargaryan was aware this could be problematic, and that angiography patients with known allergies to iodine or contrast dye are often given medications in advance of the procedure such as steroids or antihistamines to reduce the risk of an allergic reaction. The doctor in this case showed no interest in Zagaryan's allergy and seemed intent on going forward with the procedure. Zargaryan also expected the normal preop procedure of an electrocardiogram (EEG) since he has heart issues, as well as other normal preoperative tests such as complete blood count (CBC), kidney function tests, and tests concerning coagulation status to avoid bleeding issues. And finally he expected to be required to follow the normal routine of fasting for 8 hours before the procedure. None of this happened.

Instead, Zargaryan was summarily taken in a haphazard and unprofessional manner to a facility where an angiography was about to be performed without the normal preparations and safeguards. Defendant Zargaryan explained his understanding of the normal preop requirements, and alerted the medical personnel to the need to for testing and special procedures to ensure that the procedure his safe, given his medical history of sensitivity/reactiveness to iodine contrast agents and his heart condition. When it appeared the plan was to go forward without any of the normal and necessary preoperative steps, Defendant Zargaryan chose to decline the procedure until such time as a proper preoperative workup could be carried out to ensure the safety of the procedure. Defendant Zargaryan respectfully emphasizes

that he was and remains extremely grateful to the Court for its efforts to ensure that the angiography prescribed by Zargaryan's doctor is carried out. He regrets that the reckless manner in which BOP seemed prepared to do the procedure without normal and necessary preoperative tests and safeguards  left him with no option but take the action he did.

## IV.
## ARGUMENT

Defendant Zargaryan submits that the BOP/Government's erratic, inconsistent, and ineffective actions taken in response to the Court's orders of March 7, 2024 and June 3, 2024,  serve to further underscore the validity of his request for Compassionate Release.  By their actions the authorities at Sheridan have demonstrated they are unwilling and/or incapable of meeting even minimal standards of proper medical care for inmates with serious medical conditions such as Mr. Zargaryan.  This failure constitutes "extraordinary and compelling circustancs" as required under 18 U.S.C. § 3582(c)(1)(A).

When the Court directed the government in its March 7 order to schedule an angiogram or explain why it was not scheduled, the government failed to do either. The Court was forced to then issue a further order, requiring a response by June 10 and an angiography by June 17th.  Again, the government responded inadequately, filing on June 11th Under Seal and failing to make that filing available to Zargaryan or his counsel, then by scheduling a rushed, (after 9 months delay) inadequately prepared angiography that failed to take into account the most basic preoperative steps that are necessary in all cases to ensure safety for the patient – particularly so with a patient such as Zargaryan with a previously declared allergy/sensitivity to iodine and contrast agents and a known history of heart issues.  Defendant Zargaryan submits that the sum total of the government action and inaction is to confirm for the

Court that this particular team of BOP and Government personnel has proved itself to be clearly incapable of providing appropriate care in a reasonable, good faith way.

Defendant Zargaryan respectfully wishes to direct the Court's attention to further evidence of incompetence and dysfunction at Sheridan in the delivery of both medical and psychological services. In his previous supplemental filing, Defendant outlined for the Court the deficiencies in medical service at Sheridan that were found by the Department of Justice's own Office of the Inspector General in a report published on May 22, 2024. (See Exhibit A to Defendant's Supplemental Motion.) That OIG report also found extreme deficiencies in the BOP's provision of psychological services, particularly as it pertains to the provision of the Residential Drug Abuse Program (RDAP) which Defendant Zargaryan is qualified to take, and which he fully intended to participate in until Sheridan canceled the program. The following paragraph from the executive summary of the report summarizes the findings:

> Further, we found that Psychology Services Department and Education Department staff shortages resulted in significant wait times for important programs, including 600 inmates waiting to participate in the first phase of the BOP's Resolve Program, a cognitive behavioral therapy program designed to address trauma related mental health needs; 500 inmates waiting to participate in an anger management program; and 300 inmates waiting to participate in a foundational work skills class....We also were disturbed to find that serious shortages among FCI Sheridan employees who facilitate the BOP's Residential Drug Abuse Program (RDAP)—

11

only 5 of 16 of these employee positions were filled at
the time of our visit—have resulted in the institution
being unable to offer the program to many eligible
inmates who had been transferred from other institutions
specifically to participate in FCI Sheridan's program. As
a cumulative result of these issues, we found that FCI
Sheridan has offered inmates limited opportunities to
prepare for successful reentry into our communities.
Three days after our inspection concluded, BOP
Director Colette Peters suspended the RDAP at the FCI
Sheridan's minimum-security prison camp.

Defendant Zargaryan has a history of alcoholism and is in fact one of the
many inmates who were designated to Sheridan for the specific reason that it was the
primary venue for camp-based RDAP programming in the Western Region.
Zargaryan arrived at Sheridan fully committed to undertake the RDAP program to
address his substance abuse issues. Yet, just as he has been unable to obtain medical
care at Sheridan, he has also been unable to obtain the psychological services for
which he qualifies, including RDAP, and which he and other similarly situated
inmates need and are not receiving. Since arriving at Sheridan Mr. Zargaryan has
taken every step possible to gain access to the program. But as the Inspector General
report notes, RDAP at Sheridan was canceled shortly after the unannounced
inspection and Mr. Zargaryan, along with hundreds of other inmates, have been
denied the opportunity to participate in this program and through it, to access the
care and cognitive behavioral training the course would offer.

The Court is respectfully asked to consider this failure as well, and to
understand that Defendant Zargaryan is committed to undergoing a complete RDAP-
type of program externally upon release, as he is committed to addressing all of the

issues that would have been addressed via RDAP, had RDAP not been canceled by BOP Sheridan. (See Exhibit C)

## V.
## THE RELEVANCE OF
## UNITED STATES V. FARRELL

The Court is respectfully urged to consider the case of *United States v. Farrell*, NO. 2:15-cr-00029-RAJ (W.D. Wash. Jun. 14, 2021). Brian Richard Farrell, age 32, was an inmate at Sheridan in 2021 who experienced many of the same deficiencies that have been experienced by Mr. Zargaryan. Like Mr. Zargaryan, he had no success in getting treatment via the BOP at Sheridan and, like Mr. Zargaryan, he sought relief from the Court. In that case the court found that the conditions at Sheridan as experienced by Farrell constituted the "extraordinary and compelling reasons" that the Statute requires, referencing:

> "[t]here is as of now no 'applicable' policy statement
> governing compassionate-release motions filed by
> defendants under the recently amended § 3582(c)(1)(A),
> and as a result, district courts are 'empowered…to
> consider *any* extraordinary and compelling reason for
> release that a defendant might raise. '" *United States v.
> McCoy,* 981 F.3d 271, 284 (4th Cir. 2020)
> (quoting *United States v. Brooker,*976 F.3d228.230 2nd
> Cir. 2020)."

In that case the defendant sought to get an echocardiogram for more than ten months without success. In granting Farrell's motion, the court noted:

> The Court agrees with Mr. Farrell, as his medical records
> document an extraordinary and compelling basis for

reducing his sentence. In August 2020, it was a prison medical doctor who recommended that he see a cardiologist and undergo an echocardiogram. No. evidence or medical record has been supplied by the government to demonstrate this order was followed. Nor has the government satisfactorily explained why the doctor's order was not followed with a consultation for Mr. Farrell with a heart specialist or an echocardiogram for ten months. These circumstances reflect that Mr. Farrell's health is endangered with a system that has ignored conditions that may present a danger to his health. *United States v. Farrell*, NO. 2:15-cr-00029-RAJ (W.D. Wash. Jun. 14, 2021)

In sum, Mr. Farrell was granted his compassionate release request on the basis of extraordinary and compelling circumstances that are substantially similar to those experienced by Mr. Zargaryan.

## V.
## MR. ZARGARYAN HAS SERVED 10 MONTHS AND WILL BE ELIGIBLE FOR RELEASE TO RRC IN 7 MONTHS

Mr. Zargaryan self-surrendered on September 30, 2023, and had 21 days of detention credit at that time. The BOP states he is slated for release to RRC on February 26, 2025. (Exhibit D) Thus Mr. Zargaryan currently has spent 10 months in custody and has 7 months actual custody remaining before release to RRC, per BOP records. For the reasons specified herein and in all of his filings, the time spent at Sheridan has been uniquely and unnecessarily stressful and filled with conflict and anxiety caused by inexcusable medical neglect that is now fully documented, and for which it is also evident that even Court Orders are inadequate to induce a reasonable standard of care. This honorable Court is respectfully urged to consider the

tumultuous ten months already served, against the seven months remaining, when arriving at decision as to whether or not to grant what is essentially a conversion of the remaining seven months time in actual custody to home confinement.

## VI.
## CONCLUSION

Mr. Zargaryan respectfully submits that the documented failures by the BOP and Government, both generally at Sheridan and specifically as to Mr. Zargaryan, warrant the relief requested.   FCI Sheridan has demonstrated to the DOJ Inspector General and to this Court that it is incapable of fairly carrying out its responsibilities with regard to inmate physical and mental health, and that even when pressed by the Inspector General and this Honorable Court to make course corrections, it is incapable of doing so.  Allowing Mr. Zargaryan to serve out his remaining time under conditions of home confinement will allow the court's original sentence to remain uncompromised while affording Mr. Zargaryan a fair opportunity to have his medical and psychological needs met in a manner that the BOP has proven it cannot. If relief is granted, Mr. Zargaryan firmly commits to this Court that he will abide by all terms imposed by the Court and by those responsible for his supervision.  His simple, sincere request is that he simply be allowed to exit the toxic environment that has been document by the DOJ itself,  and fulfill his remaining 7 month obligations to the Court and to society via home confinement.

Dated: July 3, 2024                         Respectfully submitted
Sheridan, Oregon                            S/ _____
                                            Arman Zargaryan
                                            Reg. No. 64429-112
                                            FCI Sheridan Camp
                                            P.O. Box 6000
                                            Sheridan, OR 97378

# EXHIBIT A

 **Lakeside** Community Healthcare™   P.O. Box 371330, Reseda, CA 91337
(866) 654-3471 Option 1 | TTY 711

September 14, 2023

ARMAN ZARGARYAN
12863 NEON WAY
GRANADA HILLS, CA 91344-1049

| | |
|---|---|
| Member Name: | ARMAN ZARGARYAN |
| Date of Birth: | 07/25/1982 |
| Member ID: | 93506746F |
| Health Plan: | Health Net |
| Primary Care Physician: | YERVAND W SET-AGAYAN DO |
| | 818-242-5300 |
| Requesting Provider: | YERVAND W SET-AGAYAN DO |

LAKESIDE COMMUNITY HEALTHCARE has **approved** the following Authorization to:

| | |
|---|---|
| Specialist: | HEARTBEAT CARDIOVASCULAR MEDICAL GROUP CARDIOVASCULAR DISEASE |
| Phone: | 818-243-9600 |
| Address: | 660 W BROADWAY |
| | GLENDALE, CA, 91204-1008 |
| | 818-243-9600 |
| Place of Service: | 11 - OFFICE |
| Procedure: | 99204 - OFFICE O/P NEW MOD 45-59 MIN |
| Number of approved units: | 1 |
| Autorization Date/Number: | 09/14/2023 - 20230914L0101395 |
| Expiration Date: | 12/13/2023 |
| Diagnosis | I20.9 - ANGINA PECTORIS UNSPECIFIED |

Please call the specialist at the number listed above to schedule an appointment and take this letter with you when you go for your appointment. The specialist is responsible for verifying your eligibility on the date of the service. Any additional visits or services must be approved by LAKESIDE COMMUNITY HEALTHCARE

Please note that the Expiration Date is the last date on which this Authorization can be used. After this date, the Authorization will be automatically canceled, even if all the authorized visits have not been used.

All payments are subject to the member's updated eligibility, covered benefits, Medical Policy and reimbursement schedules. This letter does not confirm eligibility. Payment of services is based on the member's participation in the Health Plan program at the time of the visit.



0204031

# EXHIBIT B

SHE - 133017b
ATTACHMENT A

## INFORMAL RESOLUTION

**NOTICE TO INMATE:** You are advised that prior to filing a Request for Administrative Remedy Form (BP-9), you **MUST** attempt to informally resolve your complaint through your Correctional Counselor except for UDC/DHO related concerns.

Zargarian, Arman    64429-112    5    10/5/23
1. Inmate Name     Register Number    Unit    Date

2. State Below Your Specific Complaint:

   I have been in this camp since November 29th and I have been asking for medical attention I have a heart problem, liver, and high blood pressure

3. State What Action You Want Staff To Take To Correct The Situation.

   I need staff including doctors to treat me according to my conditions.

4. What Efforts Have You Made To Resolve Your Complaint Informally?    I have submitted multiple cop-outs and I have seen a doctor and nurses with no results.

*************************************************************

5. Advice To Inmate Regarding Complaint include Program Statement number if applicable)

_____

_____

_____

6. Informal Resolution WAS / WAS NOT accomplished (circle one)

_____    _____
Correctional Counselor / Date    Unit Manager / Date

# EXHIBIT C



501 E. Harvard St. # A
Glendale CA, 91205
Phone: 888-421-7277
www.JCTreatment.com

June 26th, 2024

Honorable Judge Charles Breyer
United States Attorney's Office
450 Golden Gate Avenue, 9th floor
San Francisco, CA 94102
415-436-7428

Case No. 3:15-cr-00234-CRB-19

This letter is to inform you that Mr. Arman Zargaryan (DOB 07/25/1982) has reached out to our program, Jewel City Treatment Center, in order to inquire about receiving care. Upon admission he will be begin a Partial Hospitalization Program (PHP) program to work toward recovery and sobriety. The treatment will include daily group therapy sessions, weekly individual sessions, treatment and recovery planning and weekly drug and alcohol testing. The length of treatment ranges from 3-9 months while he focuses on his recovery of addiction and any co-occurring disorder and works toward living a healthier life.   If you require further information, please feel free to reach out.

Thank you,

Rochelle Karapetian, Psy.D.
Clinical Director at Jewel City Treatment Center
Direct: 424-333-5503
Office: 888-421-7277
Admissions@JCTreatment.com

Jewel City Treatment Center is Certified by the California Department of Health Care Services (DHCS) to provide Detoxification, Intensive Outpatient and Outpatient Treatment Services. CA DHCS Certification No. 191072AP. Jewel City Treatment Center is also accredited by the Joint Commission (JCAHO) which is a global driver of quality improvement and patient safety in health care.

CONFIDENTIAL: This message (including any attachments) is confidential and may be privileged. This communication may contain material protected by HIPAA and Federal Confidentiality Regulations (45 CFR, Parts 160 & 164 and 42 CFR Part 2). If you have received it by mistake, please notify the sender by return email and delete this message from your system. Any unauthorized use or dissemination of this message in whole or in part is strictly prohibited.

# EXHIBIT D

BP-A0522
JUNE 10

SUPERVISION RELEASE PLAN CDFRM

U.S. DEPARTMENT OF JUSTICE                          FEDERAL BUREAU OF PRISONS

| Institution Name: SHERIDAN SCP | Date |
|---|---|
| Address: P.O. BOX 8000 | |
| SHERIDAN, OR 97378 | 05/08/2024 |
| Phone Number: (503) 843-4442 | |

Under the law I become eligible for:

☒ Supervised Release
☐ Parole          on    12/18/2025
☐ Mandatory Release              (Date)

I submit the following as my plans for the service of the remainder of my sentence under supervision.
Pursuant to my sentence, I must report in person to the United States Probation Office within 72 hours
of my release.

| Residence | |
|---|---|
| ADDRESS | 11900 LOUISE AVE., GRANADA HILLS, CA 91344, US |
| WITH WHOM RELATIONSHIP | WIFE, ANUSH AJKOBYAN |
| TELEPHONE | Home 818-403-4646 |

| Employment | |
|---|---|
| COMPANY AND SUPERVISOR'S NAME | |
| ADDRESS | TBD THRU PRE-RELEASE |
| TELEPHONE | |
| NATURE OF BUSINESS | |

| TO BE COMPLETED BY INSTITUTION STAFF | |
|---|---|
| SENTENCING DISTRICT | CALIFORNIA, NORTHERN DISTRICT |
| RELOCATION DISTRICT | CENTRAL DISTRICT OF CALIFORNIA |
| DETAINERS | N/A |
| SPECIAL CONDITIONS | 3 YEARS SRT; SIGNED RELEASE AUTHORIZING CREDIT REPORT TO PO, TO INCLUDE STATE/FEDERAL INCOME TAXES; MAINTAIN SINGLE CHECK. ACCT.; PROVIDE ALL REQUESTED FINANCIAL INFOR TO PO; WILL NOT TRANSFER, SELL, GIVE AWAY ANY ASSET W/ A FAIR MARKET VALUE IN EX |
| REMARKS | ***PSA CONDITIONAL RELEASE: 6-6-2025 MR. ZARGARYAN IS BEING REFERRED FOR A PRE-RELEASE RRC PLACEMENT DATE ON, OR AFTER, 2-26-2025. |

| Printed Name and Signature of Inmate<br>ZARGARYAN, ARMAN | Register No.<br>64429-112 |
|---|---|
| Witness (Case Manager) Printed Name and Signature<br>JPedraza | Date<br>05/08/2024 |
| Review (Unit Manager) Printed Name and Signature<br>Pa Russell- | Date<br>05/08/2024 |

This form is to be completed by all individuals subject to supervision by the U.S. Probation Office or
Court Service and Offender Supervision Agency for the District of Columbia. This includes Supervised
Release, Parole, Mandatory Release, Mandatory Release to Special Parole, Special Parole and Court
Designated Parole.

Record Copy - Institution; Copy - U.S. Probation Office; Copy - Inmate

FILE IN SECTION 5 UNLESS APPROPRIATE FOR PRIVACY FOLDER

# SECTION 5

PDF

Prescribed by P5321                          This form replaces BP-522 DTD SEP 99

## CERTIFICATE OF SERVICE

I, Arman Zargaryan, certify that I served a true copy of the attached Defendant's Supplemental motion by placing a copy in the United States Mail addressed to:

Claudia A. Quiroz
Sean Demark
United States Attorney's Office
450 Golden Gate Avenue
9th Floor
San Francisco, CA 94102
415-436-7428

Dated: July 3, 2024

Sheridan, Oregon

Respectfully submitted

S/

Arman Zargaryan
Reg. No. 64429-112
FCI Sheridan Camp
P.O. Box 6000
Sheridan, OR 97378

16